J-S70020-15

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| RAPHAEL SPEARMAN, | : | |
| | : | |
| Appellant | : | No. 79 EDA 2015 |

Appeal from the Judgment of Sentence July 5, 2012,
Court of Common Pleas, Philadelphia County,
Criminal Division at No. CP-51-CR-0015911-2010

BEFORE:  DONOHUE, LAZARUS and PLATT*, JJ.

MEMORANDUM BY DONOHUE, J.:  **FILED NOVEMBER 30, 2015**

Raphael Spearman ("Spearman") appeals from the July 5, 2012 judgment of sentence entered by the Philadelphia County Court of Common Pleas following his open guilty plea to carrying a firearm without a license ("6106") and carrying a firearm on the public streets in Philadelphia ("6108").[1]  The trial court sentenced Spearman to two and a half to six years of incarceration for the 6106 conviction and two to five years of incarceration for the 6108 conviction, with the sentences running consecutive to each other and consecutive to any other sentence Spearman was then serving.  On appeal, Spearman challenges the trial court's exercise of discretion in fashioning his sentence.  For the reasons that follow, we affirm.

---

[1]  18 Pa.C.S.A. §§ 6106, 6108.

*Retired Senior Judge assigned to the Superior Court.

As Spearman addresses the sole issue raised on appeal to his sentence, a full recitation of the factual and procedural history of the case is unnecessary. Spearman pled guilty to the two crimes with which the Commonwealth charged him on June 5, 2012. On July 5, 2012, the trial court held a sentencing hearing. The trial court stated on the record that it reviewed the Commonwealth's sentencing memorandum, Spearman's mental health evaluation, the presentence investigation report, and the sentencing guideline report.[2] N.T., 7/5/12, at 5. Counsel for Spearman detailed the history of Spearman's childhood, which included being born addicted to crack cocaine; placement in the dependency system at age nine because of physical and emotional abuse; the death of his grandmother (who was the only stable parental figure he had) when he was twelve; severe mental health problems (including seven documented suicide attempts) beginning at or around age thirteen; and an adjudication of delinquency when he was seventeen. *Id.* at 7-11. Following his discharge from a state facility and successful completion of probation, Spearman "was no longer under the purview of the [f]amily [c]ourt and no longer receiving any medication or [mental health] treatment," and shortly thereafter, began his involvement in the adult criminal justice system. *Id.* at 11.

Counsel for Spearman also informed the court that while incarcerated, Spearman has been stabbed four times and "continues daily to find himself

---

[2] None of these documents appears in the certified record on appeal.

defending his life." *Id.* at 17. Counsel believed this stemmed from Spearman giving the Commonwealth an August 2010 statement (which he later recanted) regarding an open homicide investigation. *Id.* at 17-18. Spearman's mother testified on his behalf as well, confirming her history of addiction, and seeking mercy for her son by the trial court. *Id.* at 15-16.

In its presentation at sentencing, the Commonwealth painted a different picture of Spearman. The prosecutor stated that Spearman was arrested three times as a juvenile, failed on probation, and required placement in four different facilities because of his aggressive and threatening behavior towards staff. *Id.* at 22, 24. He was ultimately placed in a state facility for delinquent juveniles and was arrested for the instant firearms violations within a year of the conclusion of supervision by the juvenile court. *Id.* at 22, 24-25. In 2011, he assaulted staff in a treatment facility and brought a weapon into a correctional facility. *Id.* at 25-26.

Furthermore, the firearm Spearman possessed in this case was used to commit the murder he witnessed. Initially, Spearman told police that the perpetrator of the murder gave the gun to him to hide. *Id.* at 26. While incarcerated, however, Spearman sent an affidavit to the prosecutor trying the murder case stating that he was responsible for the murder.[3] *Id.* at 27.

---

[3] The Commonwealth stated that no one in the District Attorney's Office believes that Spearman was the one who committed the murder. N.T., 7/5/12, at 27.

The Commonwealth presented testimony from Officer Anthony Solomon of the Philadelphia Police Department. Officer Solomon testified that over the past six years, he has become familiar with Spearman through contacts he has had with him on the street. *Id.* at 32. Officer Solomon knew Spearman to associate with gang members and to frequent an area known for gang activity. *Id.* at 32-33. He testified to his training and experience, which largely concentrated on street gangs and organized crime, and his knowledge about the formation and background of a particular sect of the Bloods, 252, the gang to which, in his belief, Spearman belonged. *Id.* at 36-40. He further explained that if a person claimed to be a Blood, but the person was not in fact a member of the gang, the Bloods "will issue an order to have [that person] killed." *Id.* at 38-39.

Using pictures he previously took of Spearman's tattoos,[4] Officer Solomon explained the meaning behind each tattoo and its significance in terms of the Bloods' culture:

- A tattoo over Spearman's eyebrows that says "sex $ murder," which Officer Solomon stated is a marking of the Bloods (*id.* at 38, 42);

- A bullseye with crosshairs in the center filled in red (the Bloods' color) and a teardrop filled in red, which Officer Solomon understood to mean either the individual took a life or lost someone close to them (*id.* at 39, 42-43);

- A tattoo on one eyelid that says "2$2," which Officer Solomon said stands for 252 (*id.* at 37, 45);

---

[4] The pictures were not included in the certified record on appeal.

- A tattoo on his other eyelid that says "LIE," which Spearman told Officer Solomon means "loyalty is everything" (*id.* at 45);

- On his right hand, a spider web with "brazy boy," which Officer Solomon believed meant "crazy boy," but Bloods use the letter "b" instead of "c" in words to show disrespect for the Crips, their rival gang (*id.* at 38, 45-46);

- A five-pointed star, which Officer Solomon stated is indicative of Blood membership (*id.* at 39, 47);

- The name "Mark Tart," a member of the Bloods who was killed by an off-duty police officer during an attempted robbery of the officer (*id.*);

- "Live by the trigger" and "die by the trigger" on the inside of Spearman's fingers (*id.*);

- "One Hunt Down" (for Huntington Street), "S block" (for Stanley Street), "19132" (the zip code), and "NP" (for North Philadelphia) on Spearman's left arm and "29 Street" on his thumb, all of which refer to the area the 252 Bloods congregate (*id.* at 48);

- "NP gunman" and "Blood, money" (*id.*);

- "Homey boys" on Spearman's fingers, which Spearman told Officer Solomon stands for "homicide boys" (*id.* at 48, 52).

Officer Solomon testified that the night he spoke with Spearman and took the above pictures, the tattoos on Spearman appeared to be fresh. *Id.* at 50. Spearman reportedly told Officer Solomon that he was upset that people with whom he was affiliated, another gang known as "Team A," had killed his friend, Anwar Ashmore ("Ashmore"), and he and others decided to break from Team A to form a gang of their own. *Id.* at 50-51. Spearman explained to Officer Solomon that he covered up several Team A-related

tattoos to turn them into Blood tattoos – e.g., the spider web previously only had an "A" in the middle, which he changed to say "brazy boy," and the teardrop tattoo that he filled in red – and added new tattoos to distance himself from Team A. *Id.* at 51, 53-54. Officer Solomon had pictures of Spearman prior to Ashmore's murder that corroborated this explanation. He also had pictures of Spearman with Ashmore (prior to his murder) and others, one of whom allegedly killed Ashmore. *Id.* at 54-55.

The Commonwealth also showed a music video posted on YouTube, the internet address for which was not stated on the record at sentencing. *See id.* at 58-61; 76. The trial court summarized the video as having been put together by another artist and depicting Spearman and others who were mentioned during the sentencing hearing "dealing with guns, drugs and other activities[.]" *Id.* at 76-77.

Spearman exercised his right to allocution and apologized for his actions that brought him into court. *Id.* at 65. He asked the trial court not to judge him by the actions taken by his neighbors or by his tattoos. *Id.* He explained that he is a tattoo artist and in an urban rap group, not a gang, and that the gang-related tattoos are "just a costume," likening himself to rapper Lil Wayne. *Id.* at 65-66, 72-74. The trial court questioned him about the possibility of being killed for impersonating a gang member, to which Spearman replied that he "let them know" that he's not a gang member and "didn't think it would be this, like, very important." *Id.* at 67-

68. The trial court further questioned him about being in possession of the firearm used to kill Ashmore, but Spearman stated that although he wanted to respond, he did not want to respond that day. *Id.* at 68-70.

The trial court then handed down Spearman's sentence. In so doing, it stated the following:

> I've heard the extensive testimony at the sentencing hearing. I've considered the presentence mental health reports. I've considered the Commonwealth's sentencing memorandum. Considered the presentation made by counsel [for Spearman], as well as the testimony of [Spearman]'s mother, and all the background information that's been provided regarding [Spearman]'s history both as a juvenile, the commitments, incarceration, as well as an adult.
>
> * * *
>
> Mr. Spearman, I understand you were damaged from what has happened to you in your life. But there also comes a time when the dangers to the community has to be strongly considered. In your case, I hope that you'll use the time in state prison to do what you're saying you want to do, to fundamentally deal with whatever problems you have and make whatever changes you need to. Otherwise, you're going to come back to state prison for the rest of your life from having killed someone or be dead yourself.
>
> What you've gotten involved in, what you've been doing may be a product of what happened to you from the time of birth being crack addicted and everything else that occurred. I don't think the Commonwealth disputes that. But what you've done, both in juvenile facilities and as an adult[,] make you very dangerous on the street right now.

>    You're a relatively young man. The sentence is
> not going to get you out in the near term, but it will
> get you out where you will be able to have a lot of
> your life left. What you make of your life will really
> be yours; none of us, your mother, your attorney,
> myself, nobody else.
>
> *   *   *
>
>    I appreciate your taking programs. There's a lot
> of programs in the state prison that can help you. I
> hope you'll take advantage of every one. Learn a
> trade, further education, counseling, whatever it is
> that you need to deal with anger that's in you, and
> everything else that occurred that brought you to
> where you're at.

*Id.* at 81-85.

Spearman filed a timely motion to reconsider his sentence, arguing that his sentence was excessive based on its consecutive nature and the trial court's failure to properly consider mitigating factors. The trial court denied the motion by operation of law on November 20, 2012.

On January 4, 2013, Spearman filed a pro se petition pursuant to the Post Conviction Relief Act ("PCRA"). The PCRA court appointed counsel, who filed an amended petition. On December 29, 2014, the PCRA court reinstated Spearman's direct appeal rights. Thereafter, Spearman filed a timely notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). On May 7, 2015, the trial court filed a responsive opinion pursuant to Pa.R.A.P. 1925(a).

On appeal, Spearman raises one issue for our review: "Does [Spearman]'s [] 6108 sentence constitute an abuse of discretion and should the matter be remanded for resentencing?" Spearman's Brief at 4. This issue raises a challenge to discretionary aspects of Spearman's sentence.

> Before we reach the merits of this issue, we must engage in a four part analysis to determine: (1) whether the appeal is timely; (2) whether Appellant preserved his issue; (3) whether Appellant's brief includes a concise statement of the reasons relied upon for allowance of appeal with respect to the discretionary aspects of sentence; and (4) whether the concise statement raises a substantial question that the sentence is appropriate under the sentencing code. The third and fourth of these requirements arise because Appellant's attack on his sentence is not an appeal as of right. Rather, he must petition this Court, in his concise statement of reasons, to grant consideration of his appeal on the grounds that there is a substantial question. Finally, if the appeal satisfies each of these four requirements, we will then proceed to decide the substantive merits of the case.

***Commonwealth v. Colon***, 102 A.3d 1033, 1042-43 (Pa. Super. 2014) (citations omitted), *appeal denied,* 109 A.3d 678 (Pa. 2015).

As stated above, Spearman filed a timely notice of appeal following the reinstatement of his direct appeal rights and filed a timely motion to reconsider his sentence. He includes in his brief on appeal a concise statement pursuant to Pa.R.A.P. 2119(f) wherein he purports to raise two substantial questions. First, he points to his sentence of two to five years of incarceration for 6108, which is double the aggravated guideline sentence, and the trial court's decision to run the sentence consecutively to his

sentence for 6106. Spearman's Brief at 9. He asserts that "[t]his sentence is inconsistent with 4[2] Pa.C.S.A. 9721(b) and contrary to the fundamental norms which underlie the sentencing process generally[, as t]he sentencing court did not properly explain how the sentence imposed was consistent with the protection of the public or how the sentence would serve [Spearman]'s rehabilitative needs. *Id.* Our review of the record reveals that Spearman failed to preserve this issue in his post-sentence motion to reconsider his sentence, and thus has waived it for purposes of appeal. ***See Commonwealth v. Tejada***, 107 A.3d 788, 798-99 (Pa. Super. 2015), *appeal denied*, 119 A.3d 351 (Pa. 2015).

Second, Spearman asserts that the length of his sentence for 6108, coupled with its consecutive nature, results in a manifestly excessive sentence, as Spearman pled guilty and accepted responsibility for his actions. Spearman's Brief at 9. Although preserved in his post-sentence motion, we nonetheless deny review, as Spearman fails to raise a substantial question for our review. As stated by our Supreme Court,

> [O]nly where the appellant's Rule 2119(f) statement sufficiently articulates the manner in which the sentence violates either a specific provision of the sentencing scheme set forth in the Sentencing Code or a particular fundamental norm underlying the sentencing process, will such a statement be deemed adequate to raise a substantial question so as to permit a grant of allowance of appeal of the discretionary aspects of the sentence.

***Commonwealth v. Mouzon***, 812 A.2d 617, 627 (Pa. 2002). In his 2119(f)

statement, Spearman fails to state with any specificity which section of the

Sentencing Code or the fundamental norm the trial court violated by issuing

this allegedly excessive sentence. ***See*** Spearman's Brief at 9.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/30/2015